IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,          )
------------------- Plaintiff,     )  Miami, Florida
                                   )
                                   )
                                   )
                                   )
        vs.                        )       Case No.
                                   )  08-20436-CR-DLG
                                   )
                                   )
CARLOS FLORES LOPEZ,               )
------------------- Defendant.     )  PAGES 1 THROUGH 32


                          VOLUME 1
                  TRANSCRIPT OF SENTENCING

          BEFORE THE HONORABLE DONALD L. GRAHAM
              UNITED STATES DISTRICT JUDGE

                JANUARY 4, 2010, 1:42 P.M.



APPEARANCES:

For the Plaintiff:     Ms. Andrea Hoffman, AUSA
                       OFFICE OF U.S. ATTORNEY
                       99 N.E. 4th Street
                       Miami, Florida  33132


For the Defendant:     Mr. Gregory A. Samms, Esq.
                       LAW OFFICE OF GREGORY A. SAMMS
                       225 Alcazar Avenue
                       Coral Gables, Florida  33134


Court Reporter:        Carly L. Horenkamp, RMR, CRR
                       U.S. District Court
                       400 N. Miami Avenue, Room 13-4
                       Miami, Florida  33128
                       (305) 523-5138

```
 1           (Open Court, 1:42 p.m.)

 2           COURTROOM DEPUTY:  United States versus Carlos Flores

 3    Lopez, 08-20436-Criminal-Graham.

 4           THE COURT:  Appearances, please.

 5           MS. HOFFMAN:  Andrea Hoffman for the U.S. Attorney's

 6    Office, Your Honor.  Good afternoon and Happy New Year.

 7           THE COURT:  Good afternoon.

 8           MR. SAMMS:  Gregory Samms on behalf of Carlos Flores

 9    Lopez, who is present.  Good afternoon.

10           THE COURT:  Good afternoon.

11           PROBATION OFFICER:  Good afternoon, Your Honor.  Wendy

12    Squitero on behalf of probation.

13           THE COURT:  Good afternoon.

14           Mr. Flores Lopez, have you had an opportunity to

15    review the presentence report?

16           THE DEFENDANT:  Yes, I did, sir.

17           THE COURT:  Did you discuss the report with your

18    attorney?

19           THE DEFENDANT:  Yes, I did, Your Honor.

20           THE COURT:  Did you understand the contents of the

21    report?

22           THE DEFENDANT:  Yes, I did.

23           THE COURT:  Do you have any questions about the

24    report, other than the objections which will be addressed?

25           THE DEFENDANT:  No, not at this moment, no, sir, I
```

1    don't.

2          THE COURT:  All right.  The Court will entertain

3    objections to the presentence report.  There are several filed

4    objections by both parties.  How would you like to proceed?

5    Should I entertain the government's objections first and then

6    the defense objections?  Some are related.

7          With regard to the quantity of cocaine and heroin, I

8    note that there was a quantity attributed to Mr. Lopez as set

9    forth in paragraph 63, as I recall.  Why is there a different

10   amount for John Lopez versus Carlos Flores Lopez?

11         MS. HOFFMAN:  Your Honor, we superseded the case as to

12   Mr. Carlos Lopez and added in loads that were successfully

13   delivered.  As often happens in cases, the drug amount that you

14   can prove at the time of a plea is not necessarily the drug

15   amount that you are successfully able to prove at the time of a

16   trial.  Often other people come in and cooperate, there's

17   confirmation of other loads, that you can prove additional

18   amounts of narcotics.

19         Without Mr. Lopez or Mr. Bedoya's testimony about the

20   nine additional loads that were successfully delivered, we

21   wouldn't have been able to prove those at the time against

22   Mr. John Lopez.  We had certain travel records, but we couldn't

23   have proved quantities or the nature of those.

24         THE COURT:  Well, of course, always in cases, the

25   government often proves more than the amount that was presented

1    at trial.  You come to sentencing with additional testimony

2    about additional quantities, additional acts, all within the

3    purview of the conspiracy.  So that's not an unusual concept.

4           MS. HOFFMAN:  Mr. John Lopez testified -- was

5    sentenced long before Mr. Bedoya came into the United States,

6    and as is typical of cooperation agreements, they're normally

7    structured, Your Honor, that you will not punish a defendant

8    for telling you the truth.  So the truth of those loads came

9    from Mr. John Lopez, so we couldn't then seek to punish him and

10   increase his penalty for it, based on the terms of the

11   cooperation agreement we had formed with him.  Mr. Bedoya

12   didn't come into the country until more than -- I think

13   probably close to a year after John Lopez had been sentenced.

14   So we didn't have the information at hand to have sentenced

15   Mr. John Lopez with that at the time.

16          THE COURT:  Mr. John Lopez was sentenced January of

17   2009; is that correct?

18          MS. HOFFMAN:  Yes, sir.

19          THE COURT:  And your argument is that you did not

20   become aware of the additional amounts until sometime

21   subsequent to the January 2009 sentencing?

22          MS. HOFFMAN:  No, Your Honor.  Mr. John Lopez

23   confirmed the -- what we had believed were probably successful

24   drug deliveries prior to his sentencing, but we did not have

25   independent information confirming that until Mr. Bedoya came

1    in in the summer, which I believe was June of 2009, I believe

2    is when Mr. Bedoya came in.

3         THE COURT:  Let me hear from the defense on this

4    specific point.

5         MR. SAMMS:  Your Honor, I would -- I'm troubled by the

6    differences in the amounts.  I've heard her explanation for the

7    same.  However, my problem has been, in her calculations, is

8    whether or not a simple statement by a cooperating witness on

9    the stand, without any corroboration of that or verification of

10   that or any amounts of that or any evidence that these loads

11   were seized and there were amounts of loads or any evidence,

12   that we can talk about the amounts of these loads.  In other

13   words, a bare statement, there were 20 loads and then the

14   government estimates that the loads must have been X amount and

15   adds those together, and I feel that that falls far short of

16   what the Court should consider as preponderance of the evidence

17   standard that the government has to meet.

18        THE COURT:  That's a different argument, which I

19   intend to entertain next.  The question I have is whether or

20   not the fact that John Lopez had a certain amount attributed to

21   him is some factor that the Court should consider in

22   determining an appropriate sentence in this case.

23        MR. SAMMS:  I would say yes.

24        THE COURT:  Would the government agree that Mr. John

25   Lopez and Mr. Carlos Flores Lopez were conspirators in the

1   activities of one another; is that correct?

2        MS. HOFFMAN:  I would, Your Honor.  And every load

3   that the government is seeking to hold Carlos Lopez for, John

4   Lopez was involved in, Your Honor.  The difference is with

5   respect to Carlos Lopez, is we have independent proof of the

6   loads at the time of his trial that we did not have, or

7   multiple pieces of circumstantial proof of the loads would

8   probably be a better way to say it, Your Honor, that we did not

9   have prior to the development of the PSI report as to John

10  Lopez.

11       In addition, Your Honor, as I'd said, our cooperation

12  agreement, as is standard of every cooperation agreement with

13  the defendant, is that we wouldn't seek to increase his

14  penalties based on the amounts of narcotics he told us that

15  were higher than the amounts we could prove on the day of his

16  arrest.  And for John Lopez, we could prove --

17       THE COURT:  Well, I've not seen that in plea

18  agreements, but there is a concept in the guidelines which

19  state that you shouldn't punish someone for providing

20  information to you.  I don't know if it's in the plea agreement

21  that what you tell us, we will not use against you.  Was that

22  in the plea agreement for Mr. John Lopez?

23       MS. HOFFMAN:  Excuse me, Your Honor, I didn't mean to

24  interrupt you.  It's in, I believe, his Kastigar letter, his

25  cooperation agreement letter, that he came in and spoke to us

1    under the purview of before he pled guilty.  In that letter we

2    mimic the language that's in 1B1, or come close to the language

3    of 1B1.

4              THE COURT:  Do you have the Kastigar letter as it

5    relates to Mr. John Lopez?

6              MS. HOFFMAN:  I apologize, I didn't bring it with me.

7    I would have to go back to the office and look for the copy of

8    it.

9              THE COURT:  Do you have a specific recollection that

10   there was a Kastigar hearing?  Because what typically happens

11   is that the defendant provides certain information.  There may

12   not even be a Kastigar letter in most cases.  In some cases

13   there is.  And so I guess the question is, do you have an

14   independent recollection that in this case there was a Kastigar

15   letter with Mr. John Lopez?

16             MS. HOFFMAN:  I believe there is, Your Honor.  I

17   believe I have handled it in the course of this.  It was done

18   by the attorney handling the other case, because that case came

19   to arrest dates before this case did.  The Judge Cooke case.

20   So it was a letter that was issued in that case that covered

21   his behavior for both cases, which is why we ended up merging

22   John Lopez's sentencings before one judge, because there were

23   two cases.

24             What we did in this circumstance is we brought Judge

25   Cooke's case essentially as to John Lopez and Carlos Lopez into

1    your case, with respect to Carlos Lopez, so we sort of went the

2    reverse direction with them.  And yes, I do believe -- because

3    he was the first person arrested in either of the two cases, I

4    do believe there is a Kastigar letter.  I don't know that I

5    could put my hands on it in the next ten minutes, but I

6    certainly -- if that would be of assistance, I'd have to ask

7    the Court to set this over until tomorrow, for example, and let

8    me go get that for you, but I believe it does exist.

9         THE COURT:  All right.  No, I'm simply asking if you

10   have a recollection that it is in existence.  Is this something

11   that would be on the docket sheet or not?

12        MS. HOFFMAN:  No, Your Honor, the Kastigars are not a

13   filed record item.

14        THE COURT:  All right.  Let me hear your argument in

15   support of the quantity issue.

16        MS. HOFFMAN:  Your Honor, the quantity is based, in

17   the government's perspective, based upon the three substantive

18   counts of conviction, which are Counts 13, 14, and 15, and then

19   the conspiracy count.  We have asked this Court -- there was

20   discussion of more than 20 loads that had been delivered

21   through this organization.  We asked the Court to consider --

22   we took a very conservative view and we asked the Court to hold

23   this defendant accountable only for the nine loads for which

24   there is certain degrees of independent corroboration, not just

25   one person's testimony, but there's multiple people's testimony

1    and/or travel records and/or recorded calls related to those

2    loads.  So of the 20 loads that were discussed as successfully

3    delivered, we're asking the Court to hold Mr. Lopez accountable

4    for nine of them.

5            In addition, there was -- it's impossible for any

6    successful delivered load to ascertain the amount of narcotics

7    with any view -- any way other than from testimony of

8    coconspirators.  That's the nature of a successfully delivered

9    load.  Therefore, we -- the testimony from the stand was that

10   the loads were 3 to 5 kilograms of heroin per load.  Now, every

11   seized load that the government obtained was 4 kilograms or

12   more.  However, because the defendant -- the witnesses

13   themselves said the loads were as low as three, that's what the

14   government did.  We took every load down to three.

15           So we're asking the Court to -- we're making an

16   approximation, which is the only way you can do successful

17   deliveries, and we're asking the Court for the minimum amount

18   of narcotics that the defendants -- the codefendant witnesses

19   said they delivered.  So that would be --

20           THE COURT:  Why don't you give me the testimony that

21   supports the seized loads and then the testimony that supports

22   those in addition thereto.

23           MS. HOFFMAN:  Well, the seized loads, Your Honor,

24   involved the lab reports that were entered into evidence for

25   each of those loads, and those lab reports tracked that there

1   was 4.7 kilograms of heroin in the load seized on July 17th of

2   2007, there was 4 kilograms of heroin seized on September 8th

3   of 2007, there were 4 kilograms of cocaine seized in December

4   of 2007.  Those are three of the seizures to the substantive

5   counts, 13, 14, and 15.  Now, while the case law says we could

6   ask and the Court can consider the acquitted conduct because

7   the standard is lower, we're not even going to go there, Your

8   Honor.  We'll set those two seizures aside for the acquitted

9   counts.  It's just not necessary.

10           If you then look at the nine deliveries, the dates of

11   those nine deliveries, as confirmed by the travel records for

12   John and Carlos Lopez, were two trips in January of 2006, one

13   trip in February of 2006, two trips in March of 2006, one trip

14   in August of 2006, one trip in June of 2007, and one trip in

15   July of 2007.  The ninth trip, Your Honor, is the load that

16   there was the discussion in the testimony from both John Lopez

17   and Mauricio Bedoya of the hand delivery of the load that

18   involved the kidnapping of Mauricio Bedoya that occurred in

19   January of 2007.  Those are the nine loads that the United

20   States would ask the Court to hold Carlos Lopez accountable,

21   because the other 11 loads we cannot pin to a particular day or

22   travel.  We're not seeking to -- even though there was

23   testimony from both men that the loads had been made, we're not

24   asking the Court to hold them accountable.

25           THE COURT:  All right.  Maybe I've missed a

1  calculation.  You told -- you gave me the three loads in Counts

2  13, 14, and 15.

3         MS. HOFFMAN:  Yes, sir.

4         THE COURT:  And then you gave me a listing of loads

5  and I -- six, not including the January 2007 that you told me

6  about last.

7         MS. HOFFMAN:  There was two in January 2006, one

8  February 2006, two March 2006, one in August 2006.

9         THE COURT:  One June 2007, one July 2007.

10        MS. HOFFMAN:  That's eight loads.  And the ninth load

11 is the one the Court just referenced in January of 2007.

12        THE COURT:  Independent of 13, 14, and 15.

13        MS. HOFFMAN:  Those are all independent.  Those would

14 be counts that would be covered under the conspiracy offense,

15 Your Honor.  And it's important that defendants be held

16 accountable for successful delivered loads and obviously, the

17 proof of those successfully delivered loads is always much more

18 difficult, because they get through.  We don't have lab

19 reports, we don't have the opportunity to weigh them,

20 photograph them, and present them in that format.

21        We almost always have to do it purely by testimony of

22 the codefendants who assisted in the delivery.  We have two

23 witnesses who testified to those deliveries, Your Honor, and we

24 have the travel records that confirm it, and we have telephone

25 records that confirm that the conversations that were going on

1    in the recorded calls that show you that the conversations were

2    going on in December of 2006 into January of 2007 for the

3    delivery of those loads.  If there's anything further I could

4    answer for the Court.  Otherwise, I'd rest on that argument.

5        THE COURT:  Well, there is one question.  I'm

6    wondering if it would have been prudent for us to have had a

7    special verdict form which included all of the totals that you

8    are now alleging, so that we would have the jury make a

9    finding.  What we did was to say, as I recall, more than a

10   certain amount or less than a certain amount.  Maybe it was,

11   what, more than one kilo of cocaine, more than five -- or more

12   than five kilos of heroin and one kilo of --

13       MS. HOFFMAN:  Just for the record purposes, the break

14   was for the 1 kilogram of heroin or more than a hundred grams

15   of heroin.  The other break was for 500 grams and five keys of

16   cocaine.  That's the break.  And it was a break as to each of

17   the substantive counts and a break as to the conspiracy count,

18   Your Honor.  There was not a special verdict in any form that

19   asked them to attribute days of deliveries for the successful

20   deliveries.

21       THE COURT:  Not days, but I'm referring specifically

22   to a quantity.  If I had thought of this issue, if I had known

23   you were going to argue a specific amount that had an impact on

24   the guidelines -- and I think what you're arguing has an

25   impact, correct, or not?

1        MS. HOFFMAN:  I think it does.  It's a two-point

2   difference, Your Honor.

3        THE COURT:  I would have had the jury make that

4   determination, so that we wouldn't have any question about what

5   they determined to be proof beyond a reasonable doubt.

6        MS. HOFFMAN:  I've never -- I apologize, I never even

7   thought of that, Your Honor, because I've never done a jury

8   verdict form that's framed as against the guidelines as opposed

9   to the statutory elements.  So it didn't even occur to me to

10  suggest it to Your Honor.

11       THE COURT:  Does it trouble you at all in any legal

12  sense that the jury has not made this determination beyond a

13  reasonable doubt as far as sentencing is concerned?

14       MS. HOFFMAN:  Partially it doesn't, Your Honor, and

15  probably the easiest way to make that clear to the Court for

16  why it doesn't is because you could now sentence him -- legally

17  in the Eleventh Circuit case law there's tremendous strength of

18  case law that you could sentence this defendant on Counts 11

19  and 12, for which the jury acquitted, if you find by the

20  preponderance of the evidence that we proved in the courtroom

21  that he was involved in that, for example, just to use it as a

22  specific example, that April 23rd recording.  You are entitled

23  as the authority in this courtroom to sentence him on the

24  acquitted counts.  So I don't believe -- and that's just a

25  preponderance of the evidence standard.  So the distinction of

1   beyond a reasonable doubt would not be necessary, Your Honor.

2   Successfully --

3          THE COURT:  Justice Scalia may take issue with you on

4   that point, but I understand your argument.

5          MS. HOFFMAN:  Currently the Eleventh Circuit case law

6   is an odd beast and that's why I didn't ask this Court.  Judge

7   Middlebrooks, who I've had this before where I've had split

8   verdicts, declined to do it as well.  And I'm not even going to

9   ask the Court do that because there's a troubling component to

10  sentencing somebody to something that a jury has acquitted them

11  of.

12         That's not true of the successfully delivered loads,

13  and there were telephone calls that confirmed those loads, the

14  travel records that confirmed those loads, and two witnesses.

15  So the strength of this evidence which this Court unfortunately

16  has heard twice, I think is more than sufficient for you to be

17  able to sentence them in good conscience.

18         THE COURT:  So your argument would be what paragraph

19  should be adjusted and to what extent?

20         MS. HOFFMAN:  Paragraph 86 of the PSI, Your Honor,

21  which is on page 25, and the calculation would end up at a

22  level 38, not a level 36, Your Honor, and the amount of drugs

23  done as the conversion would be -- you would be converting

24  40.7 kilograms of heroin and 4 kilograms of cocaine, which

25  would give it a calculation in excess of 40,700 kilograms of

```
 1    marijuana, which would put it well above -- the level 38

 2    standard is 30,000, so I think it would put it well over that.

 3              THE COURT:  All right.  Let me hear from the defense.

 4              MR. SAMMS:  Well, Your Honor, just as a point of

 5    order, I wanted to ask if the government is abandoning its

 6    argument for the additional loads in paragraph 3 of their

 7    objections to the 20 loads, because most of the argument that

 8    I've heard was on her paragraph 4 argument where she is arguing

 9    about loads that she alleges were successfully delivered.  So

10    are we now abandoning her arguments on the 20 loads that was

11    discussed?

12              MS. HOFFMAN:  Your Honor, I don't consider it an

13    abandonment at all because I'm not making any different

14    position.  My last sentence said, again, in an abundance of

15    caution, the government asks the Court to only include the

16    narcotics loads for which there is corroboration.  So what I

17    was doing in that paragraph was telling the Court there are 20

18    loads, nine of which I can corroborate by telephone, travel

19    records, and multiple witnesses.

20              THE COURT:  And those are the loads that you desire

21    the Court to attribute to the defendant for guideline purposes

22    and not a quantity in excess thereof.

23              MS. HOFFMAN:  Correct, Your Honor.

24              THE COURT:  All right.

25              MR. SAMMS:  Thank you.  Judge, as far as her arguments
```

1   based on what she's outlined in paragraph 4 of her objections

2   are the loads that she indicates were successfully delivered, I

3   would still stand on my arguments that I previously made as to

4   her calculations of those loads.  The proof that came out at

5   trial on those loads were not succinct enough for the Court to

6   make a finding by a preponderance of the evidence that these

7   loads occurred with a certain amount of drugs, whether it be

8   cocaine, whether it be heroin, which makes a difference, what

9   kind of drugs are we talking about in these loads, what was the

10  amount of these loads, what was the weight of these loads.

11  Those kinds of things are not there.

12          So what the government is doing at this point, since

13  this matter was not given to the jury to make a determination

14  as to how much quantity of drugs we're talking about, is making

15  her best assessment of that and asking the Court to accept

16  that, and if the Court accepts it, the Court has to accept it

17  by a preponderance of the evidence.  And I don't feel that that

18  has been substantiated through the trial and it certainly is

19  not being substantiated unless there is some additional

20  testimony coming in today to establish that.  So based on what

21  we have --

22          THE COURT:  Well, let's look at the presentence

23  report.  Are you taking issue with the fact that the quantities

24  alluded to by the government are not set forth in the

25  presentence report?

```
 1              MR. SAMMS:  Exactly.

 2              THE COURT:  And so the government has given me sort of

 3    a cursory outline.  Is it your position that these additional

 4    amounts, other than what the probation officer determined, are

 5    included in the facts in the presentence report?

 6              MR. SAMMS:  No, that's not my position.  I'm just

 7    addressing her objection because the way she is presenting

 8    it --

 9              THE COURT:  I'm asking Ms. Hoffman now, because I

10    remember there was some discussion from the probation officer

11    saying I based the guidelines on the information given to me by

12    the case agent.

13              So Ms. Hoffman, is there other testimony that you are

14    relying on which is independent of the presentence report?  Or

15    would I be able to read the report and make the findings that

16    you were arguing?

17              MS. HOFFMAN:  Your Honor, the testimony that occurred

18    in the trial is not --

19              THE COURT:  No, that's not the question.

20              MS. HOFFMAN:  What I'm saying is the only proof of the

21    amounts comes from the witness stand that this Court --

22              THE COURT:  That's not the question.  The question is,

23    is proof of the amount you are arguing set forth in the

24    presentence report?

25              MS. HOFFMAN:  Your Honor, when I spoke to the pretrial
```

1    services officers, I provided my closing argument summary and I

2    provided a verbal discussion of what I've said.  That has not

3    been incorporated -- Your Honor, if I could finish?

4         THE COURT:  I can't get an answer.

5         MS. HOFFMAN:  I'm getting there.  That was not

6    incorporated into the calculation in paragraph 86 or I wouldn't

7    have filed an objection.  So no, it's not there.

8         THE COURT:  That's the question.

9         MS. HOFFMAN:  Their position was they weren't present

10   for the testimony, so they weren't relying upon that testimony,

11   they were deferring to the Court's observance of the testimony.

12   I wouldn't have filed an objection if it had been incorporated.

13   It's not been incorporated and that's why I'm filing

14   objections.

15        THE COURT:  But when you file the objection, then you

16   submit to me the facts that support your position.

17        MS. HOFFMAN:  Well, I did believe I did that in the

18   objections, Your Honor.  You know, could I have done it in

19   greater detail?  I didn't have the transcripts to cite to the

20   Court the pages yet, but I referenced the testimony that was

21   discussed and the fact that there were the two witnesses who

22   testified about it, Your Honor.  Your having heard the court

23   case twice, I didn't put it in extensive detail.

24        THE COURT:  Well, ma'am, sorry, but I really don't

25   recall all of the testimony from several months ago.

1        MS. HOFFMAN:  I apologize.

2        THE COURT:  I wish I did have such a recollection, but

3   I do not.

4        I want to be clear.  You base your report on what

5   information?

6        PROBATION OFFICER:  Well, Your Honor, the information

7   within the report was written by the lead officer in the case,

8   Janice Smith, and she was provided this information by the

9   government.  And when we received the objections as to my

10  report, I was told by the lead officer that we did not have all

11  the information, we had the information as to the successful

12  loads and the seized loads.  And it was right before the

13  holidays, so no one was really in the office to get more

14  clarification, which everybody returned today.  So when the

15  report went out, I had to rely on the information that I was

16  provided with.

17       THE COURT:  Is there information other than docket

18  entry 422 or is that the totality of your response,

19  Ms. Hoffman?

20       PROBATION OFFICER:  That's the totality of my

21  response, is 422, docket number.

22       THE COURT:  422.

23       MS. HOFFMAN:  For the record, 422 is my objections and

24  yes, it is the totality of what I've submitted to the Court.

25       THE COURT:  That's what I was referencing.

1    MS. HOFFMAN:  Yes, it is my objections, Your Honor.

2    Your Honor, simply for record purposes, could I add

3    one more sentence or two, just for when this goes up on appeal?

4    The travel records that I've referenced here today are

5    Government's Exhibits 20 and 21 that incorporate the travel

6    dates, and then the remainder of the information that I'm

7    talking about is in the --

8    THE COURT:  Do you have 20 and 21?

9    MS. HOFFMAN:  I apologize, I do not, but I just wanted

10   to reference it for the record purposes, Your Honor.

11   THE COURT:  Well, it's nice to reference it for the

12   record, but it would be nice if I could consider it.  See,

13   you're asking me to make some findings and I can't remember,

14   obviously, everything that was presented at trial, and so

15   that's why I inquired.

16   MS. HOFFMAN:  I understand, Your Honor.

17   (Pause.)

18   THE COURT:  I have read your submission, Ms. Hoffman,

19   and frankly, I don't feel comfortable making factual

20   determinations on summaries.  And so if you want to put

21   together a log or something that supports your general

22   statements, then I'm happy to consider that.  I will say,

23   however, that given the case and the testimony and the dictates

24   of 3553 that there should be some equity in sentencing, that

25   that's a factor that I'm probably going to consider in

1    determining an appropriate sentence.  So I'll leave it up to

2    you as to how you desire to proceed on that point.

3            MS. HOFFMAN:  Your Honor, I guess there's two ways

4    that I'd like to proceed.  Yes, I would like to have the

5    opportunity to do it if that would be of assistance to Court.

6    The second thing I'd like to do, therefore, then, I don't

7    believe there's been a transcription yet of the trial testimony

8    of the second trial, because obviously, the sentencing hasn't

9    occurred.  Ordinarily that would occur in the flow as it goes

10   along as the defendant files an appeal.

11           THE COURT:  You could easily do that from the -- you

12   wouldn't need the transcript of the trial.  What you would need

13   would be the transcripts and the exhibits received.  You could

14   have a diagram of that, because you submit that that supports

15   your position.

16           MS. HOFFMAN:  Those are the corroboration to the

17   testimony.  So what I would like to do is if I can ask your

18   court reporter, I would order an expedited version of just the

19   two witnesses I need to support the testimony and the

20   supporting documentation.  And I can present it back to the

21   Court that way and that's fine.  I'm happy to do that.  I

22   hadn't ordered the transcripts, but I can do that, excerpt the

23   testimony for you and then the corroborating pieces of record

24   that support their testimony for the nine loads, and I can do

25   that fairly readily.  I can do it within a week of having the

1   transcripts in my hands.  So whatever timing is appropriate for

2   your court reporter, I will turn it around for you, Your Honor.

3           THE COURT:  It is probably going to take up to two

4   weeks to produce the transcripts because we're starting a civil

5   trial in the next couple of days, a bench trial, and then

6   immediately thereafter, a ten-day civil trial, so it's going to

7   take a little time.

8           So I think what I'm going to do is to just simply --

9   I'm going to litigate all of the other issues.  On this issue,

10  you can order the transcript.  When it's provided and you

11  submit your pleading and I'll give the defense an opportunity

12  to respond and then we'll set the hearing.

13          MS. HOFFMAN:  That's fine, Your Honor, and I'll order

14  it on an expedited basis just because we're putting your court

15  reporter under pressure, and we'll get it as is convenient for

16  her.

17          THE COURT:  All right.  Let's go to the next

18  objection.

19          MS. HOFFMAN:  For the government, Your Honor, the

20  other objection is the question of obstruction of justice based

21  on the testimony of the defendant in the first trial.  As the

22  Court was present for that, the trial testimony was fairly

23  extensive by Carlos Lopez, describing what he said were the

24  reasons for the eight trips that we've been discussing that

25  were accounted for in the travel dates.

1          Mr. Lopez said that -- Carlos Lopez, excuse me, said

2     that those trips were for -- five of them were for the travel

3     to purchase an automobile from some sort of automobile auctions

4     up in the northeast.  He said that some of the trips were for

5     travel to purchase an iPod in New York.  He said that at least

6     one of the trips was for travel to purchase a purple leather

7     jacket from a Potomac Mills outlet in the Maryland/D.C. area.

8     He had quite a number of elaborate different descriptions for

9     the bases for these trips, for how they went out, for what his

10    behavior was on those trips.  He talked about sleeping in and

11    being in hotel rooms and being up -- in late, not being up, and

12    Mr. John Lopez getting up and out and going about and traveling

13    around more than he was.  It was quite an extensive and very

14    elaborate description of what the reasons and the

15    justifications were for those trips.

16          Based on the convictions on the various counts,

17    Mr. Lopez did not testify in the second trial, so this

18    testimony was part of the first trial that was a hung jury, as

19    the Court is aware, and then we tried the case a second time.

20    Carlos Lopez did not testify before the jury the second time

21    and was convicted in the end.

22          THE COURT:  Shouldn't this determination be made on

23    the second trial?

24          MS. HOFFMAN:  The obstruction of justice issue can go

25    across the span of the entirety of the case, Your Honor.  It

1    can be based on something that he did in his pretrial detention

2    hearing, you know, depending on what he had to say on his

3    pretrial detention hearing.  He's liable for his conduct and

4    the truthfulness of his behavior in any proceeding before the

5    District Court for the Southern District of Florida.

6         THE COURT:  As you were aware, pursuant to 3C1.1, an

7    enhancement is not intended to punish the defendant for the

8    exercise of a constitutional right.  The defendant's denial of

9    guilt, refusal to admit guilt or provide information to a

10   probation officer, refusal to enter into a plea, et cetera, is

11   not a basis for application of 3C1.1.

12        You know, I've been around for 18 years.  I've heard

13   a lot of different stories.  And frankly, it's hard to

14   determine what's correct and what's not correct.  And I am not

15   going to determine that the enhancement for obstruction of

16   justice is appropriate in this case.

17        MS. HOFFMAN:  If I might just add the one other

18   argument I was going to say, Your Honor, and I apologize, I

19   didn't get it all out at once, and this can be simply for

20   record purposes.

21        One of the points of his testimony was he wasn't in

22   the car on April 23rd, 2009 -- 2008, excuse me.  And as the

23   Court is aware, we did a voice exemplar examination of whether

24   he was present in that car.  And while the scientific standards

25   haven't risen to a level of presenting that before a jury, that

```
 1        test did come back as him.
 2                THE COURT:  I'm not going -- you know the law on that
 3        issue.
 4                MS. HOFFMAN:  I know where you're going.  I just want
 5        it for the record, Your Honor.
 6                THE COURT:  That's already a part of the record.
 7                MS. HOFFMAN:  Thank you.
 8                THE COURT:  I appreciate your argument.
 9                Additional objections.
10                MS. HOFFMAN:  Those are it from the government, I
11        believe, Your Honor.
12                THE COURT:  Defense objections.
13                MR. SAMMS:  Yes, Your Honor.  I did have an objection
14        in regards to the probation department attempting to enhance
15        Mr. Lopez for violating a position of trust.  I outlined my
16        objections in my memorandum and it's our position that in order
17        for this particular enhancement to be viable, what the case law
18        indicates, it has to be more than because he's an employee of
19        the airport, his employment status makes it more readily
20        apparent for him to be able to do an illegal drug transaction,
21        such as handling the bags, et cetera.  The case law points out,
22        as I outlined in my memorandum, that every employee on every
23        job has the trust of their employer and can use that trust in
24        order to facilitate a crime through their employment status.
25                So in order for him to be enhanced under this
```

1   particular provision, the case law has indicated that it has to

2   be more than he's just an employee; he has to be able to have

3   the opportunity to effect policy.  In this particular case, he

4   would have to be able to change the way the baggages are moved

5   by his own order.  In other words, he has to have the

6   supervisory authority to make these types of policy changes,

7   which he cannot do.  He is a crew chief, but his job or his

8   description of what he does is no different from the case that

9   I cited in my memorandum.

10          THE COURT:  Isn't he in charge of scheduling other

11   ramp agents?

12          MR. SAMMS:  No, he is not in charge of scheduling the

13   ramp agents.  If you remember what the testimony was at the

14   trial, Mr. Lopez says there were expediters who were already

15   working baggage that could change the tags on the bags.

16   Mr. Lopez was never one to change the bags.  Neither was

17   Mr. Carlos Flores Lopez.

18          What the testimony was from John Lopez was, is that

19   these expediters already worked there and they are told to look

20   out for a bag and when the bag comes, they change the tag on

21   the bag and move it from international to domestic.  That's not

22   a change in policy.

23          What the case law would mean is that Mr. Flores Lopez

24   would have to be able to say, okay, today we're not going to

25   move the bags like we usually move them; we're going to move

1    them in a totally different way and from now on, we'll move it

2    this way because I have supervisory authority and I can order

3    all of you baggage handlers to do that.  And there was no

4    evidence of any type of supervisory authority of that level

5    that Mr. Lopez had.

6              THE COURT:  What was -- let me ask the government,

7    what was the testimony about his duties as a crew chief?

8              MS. HOFFMAN:  Your Honor, part of his duties as a crew

9    chief is determining who is on his staff, who is working,

10   selecting who works at the time that he works, and he can have

11   an ability to affect the shifts and the times.

12             THE COURT:  Was that the testimony presented at trial?

13             MS. HOFFMAN:  Yes, Your Honor.

14             THE COURT:  And that's consistent with the probation

15   office's determination.  Assuming the defendant was a crew

16   chief in charge of scheduling ramp agents to make sure they

17   were in place at the correct time when these loads occurred,

18   the two-level enhancement would be appropriate.  There were all

19   sorts of security measures at the airport and there was

20   testimony about the security measures.  Given the defendant's

21   position as the crew chief, the Court believes that the

22   two-level enhancement is appropriate.  The objection is

23   overruled.

24             Additional objections.

25             MR. SAMMS:  Judge, I don't believe I had any

```
 1    additional objections other than what we discussed.  Let me

 2    make sure.

 3           Your Honor, in addition, I filed a sentencing

 4    memorandum, but it's not an objection to the PSI report.

 5           THE COURT:  Yes, I am familiar with that issue, and I

 6    suppose to the extent that it involves a sentencing issue, I

 7    should entertain the issue.  I will say, Counsel, that your

 8    requests for departure based on 5H1.1 is not really an

 9    appropriate one, given the case law.  As you are aware, in

10    Section 5H1.1, age is not ordinarily relevant in determining

11    whether a departure is warranted.  Age may be a reason to

12    depart downward in a case in which the defendant is elderly and

13    infirm and where a form of punishment such as home confinement

14    might be equally efficient and less costly than incarceration.

15    So 5H1.1 is not appropriate in this case as a basis for a

16    downward departure.  The defendant is not elderly and he is not

17    infirm, and home confinement would not be appropriate in this

18    case.

19           MR. SAMMS:  That is correct, Judge.

20           THE COURT:  So your request for a departure pursuant

21    to 5H1.1 is denied.

22           MR. SAMMS:  Your Honor, can I speak to that?  I wasn't

23    actually --

24           THE COURT:  You can speak to it, but --

25           MR. SAMMS:  I wasn't actually saying to the Court that
```

1    5H1.1 was the basis for a reduction.  That wasn't the argument.

2    I was just starting out by pointing out to the Court that age

3    has been a factor in that particular guideline, and then I go

4    on to show -- to say to the Court that what I'm really saying

5    is that he should be sentenced to a time that is sufficient for

6    what he did.  In other words, not overly given an excess amount

7    of time, but an amount of time that is sufficient under 3553.

8    So I start out with that argument just to say and to show the

9    Court that if we look at his life expectancy, and under the

10   factors of 3553 -- in other words, what is -- what is necessary

11   for the protection of the community, what is necessary in order

12   to give others out there who may do this type of crime notice

13   that this is a serious offense, what is necessary in order to

14   give him punishment.

15          So if we start with the proposition that he's got 30

16   years of life expectancy left, if you sentence him to ten

17   years, we're already talking about one-third of his life that

18   he's being sentenced to, and what the argument that I'm making

19   is, is that that is more than sufficient in light of his

20   expectancy and in light of the fact that age can be looked at.

21   If we start sentencing to 20 years, now we're talking about

22   60-something percent of his life expectancy that he's going to

23   be spending in prison.  When we get into the 60-year-old range,

24   and if we sentence him to 30 years, now he's 70, or 80.

25          So that's the point that I'm making to the Court.

1      It's not necessarily that I'm saying that 5H1.1 is the basis.

2      But I'm starting there to argue that if we sentence him too

3      harshly, then we're doing -- we'll be outside of what the goals

4      of 3553 are.

5            THE COURT:  Well, the reason that I ruled the way I

6      did is because you have reasons for departure and you have

7      5H1.1, and so as a reason for departure, it would be

8      inappropriate to depart downward.  Your additional argument is

9      that under 3553, the sentence is too harsh for various reasons.

10           MR. SAMMS:  Yes.

11           THE COURT:  And that is something that I will rule on

12     independently at the time of sentencing.  So I think I've

13     handled all of the legal issues, other than the matter that I'm

14     going to give the government an opportunity to brief.  I think

15     we can meet this date so --

16           Am I here on this date?

17           I would like to get this matter resolved this month, I

18     can tell you that, so as soon as the court reporter can get the

19     information to you and we can get this issue briefed, we'll

20     schedule the next date.

21           Are there any other matters I can address?

22           MS. HOFFMAN:  Not for the government, Your Honor.  And

23     Your Honor, for everyone's purpose, to make this more

24     efficient, I will attach to the response the government makes

25     the trial exhibits and the record excerpt transcript pieces, as

1   opposed to just the whole block transcript.  I'll cut it into

2   the pieces -- I mean, I'll --

3           THE COURT:  I would like for you to be as specific as

4   you can.

5           MS. HOFFMAN:  I'm going to cut it to the page to make

6   it short and to the point.

7           THE COURT:  And then you can respond accordingly.

8           MR. SAMMS:  Yes, sir.

9           THE COURT:  All right.  Thank you very much.  We are

10  in recess.

11      (Proceedings adjourned at 3:35 p.m.)

12                       *   *   *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATES OF AMERICA                          )
                                                        )    ss:
2    SOUTHERN DISTRICT OF FLORIDA                       )

3

4                        C E R T I F I C A T E

5         I, Carly L. Horenkamp, Certified Shorthand

6    Reporter in and for the United States District Court for the

7    Southern District of Florida, do hereby certify that I was

8    present at and reported in machine shorthand the proceedings

9    had the 4th day of January, 2010, in the above-mentioned court;

10   and that the foregoing transcript is a true, correct, and

11   complete transcript of my stenographic notes.

12        I further certify that this transcript contains

13   pages 1 - 32.

14        IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15   Florida, this 14th day of May, 2010.

16

17

18                        s/ Carly Horenkamp

19                        Carly L. Horenkamp, RMR, CRR
                          Certified Shorthand Reporter

20

21

22

23

24

25